198 So.2d 1 (1967)
William G. O'NEILL, John J. Crews, Jr. and A.J. Thomas, Jr., Appellants,
v.
Haydon BURNS, Governor of the State of Florida et al., Appellees.
No. 34747.
Supreme Court of Florida.
January 25, 1967.
*2 William G. O'Neill, Ocala, for appellants.
Earl Faircloth, Atty. Gen., Fred M. Burns and Wilson W. Wright, Asst. Attys. Gen., James S. Quincy, Gainesville, and Joseph A. Wanick, Miami Beach, for appellees.

ON PETITIONS FOR REHEARING
CALDWELL, Justice.
The petitions for rehearing have been considered.[1] Our original opinion of October 26, 1966, has been revised in certain particulars and the petitions for rehearing have been addressed to the opinion as revised. When so considered the petitions are denied.
This cause is here on appeal from the decree of the Chancellor sustaining the constitutionality of Chapter 65-277, Laws of Florida, an Act appropriating $50,000 to the Junior Chamber International. The appellants sought declaratory and injunctive relief against appellees, contending the Act was unconstitutional in that it constituted a pledge or a loan of the credit of the State of Florida in violation of § 10, Article IX of the Florida Constitution, F.S.A. Appellants also contend the title of the Act is deficient and that the Act constitutes an unconstitutional delegation of legislative authority.
The Legislature of the State of Florida, regular session of 1965, enacted Chapter 65-277, as follows:
"Section 1. There is hereby appropriated from the general revenue of the state of Florida the sum of fifty thousand dollars ($50,000.00) to the board of commissioners of state institutions to be paid to junior chamber international for the creation of permanent headquarters in the state of Florida, provided however, that such sum shall not be paid to junior chamber international until a municipality of the state of Florida pledges an equal or greater sum of money or value in lands and buildings and that the location within the municipality is a site suitable to junior chamber international for a permanent headquarters building."
The Junior Chamber International, an organization of Junior Chambers of Commerce, is a non-profit corporation. Its purpose, as set forth in its Constitution, is "To develop and advance the purposes of junior chamber, to coordinate the activities of its members to achieve this, and to promote the extension of membership to all young men." The purpose of the Junior Chamber organizations is: "To develop the individual abilities and stimulate the joint efforts of young men for the purpose of improving the economic, social and spiritual well-being of mankind, by developing responsible citizenship, training programs to develop leadership, planning and executing programs for individual and community development, promotion of economic development and the furtherance of understanding, goodwill and cooperation among all peoples."
The decree of the Chancellor includes a painstaking statement of all pertinent facts and a scholarly treatment of applicable precedent. Inasmuch as our decision turns on the first point, whether the Legislative Act in question violates the provisions of § *3 10, Article IX, of the Florida Constitution,[2] we will not discuss at length points two and three, having to do with the sufficiency of the title and delegation of authority.
In his consideration of whether the Act constituted violation of § 10, Article IX of the Florida Constitution, the Chancellor pointed to Bailey v. City of Tampa,[3] a case holding the City could validly convey to the Tampa Board of Trade a parcel of land upon which the Board of Trade agreed to construct a building. The Court found these facts:[4]
"In addition to the facts shown by that part of the contract here quoted, the record disclosed that the Tampa board of trade had already perfected its arrangements and secured plans and specifications which had been approved by the city of Tampa for the erection of an 18-story office building on the lands described in said contract, free of cost to said city, but at a cost of not less than $400,000 to the Tampa board of trade, the said building to be modern in every respect, with a useful life of at least 75 years; that a very large portion of said building was to be turned over for the use and disposal of said city at the time of completion, and that within 35 years the whole of said building, including the lands on which it was located, reverted free of cost to the city, except such office space as may be necessary for the Tampa board of trade to carry out the purpose of its organization and to operate consistent with public interest. It is also shown that in design, utility, and appearance the said building must be constructed to respond to the various demands of the city of Tampa, and, if not constructed within 3 years, the contract to be void and the lands reconveyed to the city."
The plans and specifications had been prepared and approved and the size, cost, useful life of the building and completion date were established by the contract. Also, a large portion of the building was for the immediate use of the City and both building and lands would revert to the City after 35 years.
The Chancellor thought Raney v. City of Lakeland[5] similar to the case at bar. The Raney case involved a lease of certain municipal property by the City of Lakeland to the Garden Club of Lakeland for a nominal rental. The lessee was required to establish and maintain, as a public service to the citizens of Lakeland, a public library of specified purpose and an educational information service in the field of horticultural beautification. The building, including the library offices, auditorium, club room and exhibition facilities, was to be started within two years and revert to the City at the end of the term. The agreement included covenants against assignment and subletting and provided for cancellation upon breach of any covenant.
The Court, in the Raney case, supra, found the Garden Club of Lakeland was quasi-public in nature and that, under the lease, the club was obligated to render a public service, not limited to its own membership and was precluded from exploiting the land and improvements for private gain.
In the cause before us there is no obligation that the building or lands involved are to serve any public agency or the public generally. Neither is there a provision for *4 reversion to the State, the source of the funds here in controversy.
Many other decisions of this Court have dealt with the proscription inherent in § 10, Article IX, of the Florida Constitution. In State ex rel. Barnett Nat. Bank of DeLand v. Thursby,[6] we approved the appropriation of funds by a county to a non-profit county fair association for the conduct of a fair. Overman v. State Board of Control[7] upheld an Act appropriating funds to the first accredited medical school established in the State. State v. Board of Control[8] validated an issue of university dormitory revenue certificates, and held the fact that individual students would benefit did not deprive the dormitories of public character. In State v. City of Miami,[9] the issuance of revenue certificates to finance construction of a warehouse to be leased to the Orange Bowl Committee, a non-profit organization, was upheld. State v. City of Tampa,[10] upheld the construction of a convention center by a municipality on land leased from a private corporation. But, in the case of City of West Palm Beach v. State,[11] involving the construction of a civic center, marina, and other facilities to be leased to a private corporation having control over the project, this court held the arrangement was "an improper subsidy of private enterprise with public money." The Court distinguished its earlier decision in Panama City v. State,[12] upholding the issuance of revenue bonds to construct a marina, on the grounds that in the Panama City case the City retained control of the project and leased the various units.
The question confronting us is whether the appropriation to Junior Chamber International is for a public purpose. The Chancellor found: "The very fact of the location of the permanent headquarters at Miami Beach promotes tourism to that City and to Florida generally, but this alone would be merely incidental. It is really the tremendous volume of mailed and otherwise distributed material which publicizes Miami Beach and Florida and directly promotes its tourism that serves a public purpose which would authorize expenditure of state or local property, money, or the pledge or loan of their credit in its furtherance." He correctly stated: "It is only when there is some clearly identified and concrete public purpose as the primary objective and a reasonable expectation that such purpose will be substantially and effectively accomplished, that the state or its subdivision may disburse, loan or pledge public funds or property to a non-governmental entity such as a non-profit corporation," and further, that "There must be some control retained by the public authority to avoid frustration of the public purpose."
We must disagree, however, with the Chancellor's application of the principles and authorities reviewed. A public purpose of primary, as distinguished from incidental, benefit to the public has not been shown in the case before us. The fact that Florida, as an address, may appear on letterheads and envelopes and will appear on postmarks of mail forwarded from the headquarters is obviously beneficial to the State but we do not believe that benefit to be more than incidental. Also, it does not appear that any semblance of control of the contemplated property is retained in the State.
To hold valid the appropriation here considered would necessitate an enlargement upon the philosophy established in the landmark cases of Bailey and Raney, supra, and would be tantamount to saying that like appropriations could validly be made to any national or international non-profit organization which, in the course of its operation, may send large volumes of mail out of the State. Although, as a matter of *5 popular appeal, such course may tend to desirable ends, the practice, absent a measure of public control and a primary public purpose to be served, is not authorized by the Constitution of Florida.
Reversed.
DREW, J., concurs with opinion.
THOMAS, J., concurs and agrees with DREW, J.
O'CONNELL, J., concurs.
ERVIN, J., dissents with opinion.
THORNAL, C.J., and ROBERTS, J., dissent and agree with ERVIN, J.
DREW, Justice (concurring).
I am unable to conclude that the public purpose, promotion of tourism, relied on to sustain the controverted statute in this case, is anything more than an incidental result of an act which in simple and unconditional terms appropriates $50,000 "to junior chamber international for the creation of permanent headquarters in the State of Florida" on land or equivalent value pledged by a municipality. There is no dispute.
The worthy character and objectives of the recipient organization, a non-profit corporation, seem to me quite irrelevant to the issue here. It is not in any legal sense a public body nor is it, under the terms of the statute, subject to any continuing governmental control in the use of the subject funds. The direct primary and explicitly stated purpose of the contribution is the creation of a headquarters which will belong to the corporate body. Obviously the major use or purpose served is the corporate purpose. The expected result, however reasonable or probable, that the conduct of the regular corporate business will result in state advertisement, still must be recognized as merely incidental to the primary business or activity being financed by state funds. Certainly the appropriation is not even in practical terms a contract for the conduct of promotional services through a private organization.
The cases, in my opinion, clearly reject the idea that private enterprise may be financed for the sake of incidental public benefit, and have required in every instance that the direct and primary purpose served by the expenditure of state money or credit shall be the furtherance of a public or governmental function.[1] There are, of course, an ever-increasing variety of techniques employed toward the worthy objective of promoting economic development. But as stated in past opinions, if we approve the use of state funds or credit "to build and finance private enterprises and put such enterprises in the exclusive possession and control * * * as is proposed to be done here, in order to * * * promote the economic development of the area, then there is no limit to the extent to which the credit of the State and its authorities may be extended to private interests. In such event the constitutional provision above quoted will become meaningless."[2] I remain convinced that "under our organic law public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern. It does not matter * * * how worthwhile they may appear to be at the passing moment. The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system."[3]
Therefore, for these, as well as the reasons expressed in the opinion of CALDWELL, *6 J., in which I concur, I would reverse the decision of the trial court.
THOMAS, J., concurs.
ERVIN, Justice (dissenting):
This is an appeal from a decree of the chancellor sustaining the constitutionality of Chapter 65-277, Laws of Florida. The chapter in question is an act appropriating $50,000 to the Junior Chamber International. Chapter 65-277, enacted by the Legislature of the State of Florida during regular session of 1965, reads in part as follows:
"Section 1. There is hereby appropriated from the general revenue of the state of Florida the sum of fifty thousand dollars ($50,000.00) to the board of commissioners of state institutions to be paid to junior chamber international for the creation of permanent headquarters in the state of Florida, provided however, that such sum shall not be paid to junior chamber international until a municipality of the state of Florida pledges an equal or greater sum of money or value in lands and buildings and that the location within the municipality is a site suitable to junior chamber international for a permanent headquarters building."
The Appellants sought declaratory and injunctive relief against Appellees, contending that the act was unconstitutional in that it constituted a pledge or a loan of the credit of the State of Florida in violation of § 10, Article IX of the Florida Constitution. Appellants also contend that the title of the act is deficient and that the act constitutes an unconstitutional delegation of legislative authority.
The learned chancellor found from the evidence before him, and so states in his perceptive opinion, that the Junior Chamber International is a non-profit, quasi-public corporation. It obtained its charter from the Circuit Court of Dade County on September 10, 1957. The membership of the Junior Chamber International is comprised of members which are themselves the national associations of Junior Chambers of Commerce in their respective nations. The purpose of the organization, as set forth in its constitution, is "to develop and advance the purposes of Junior Chamber, to coordinate the activities of its members to achieve these, and to promote the extension of membership to all young men." Further basic purposes of Junior Chamber organizations are:
"* * * to develop the individual abilities and stimulate the joint efforts of young men for the purpose of improving the economic, social and spiritual well-being of mankind, by developing responsible citizenship, training programs to develop leadership, planning and executing programs for individual and community development, promotion of economic development and the furtherance of understanding, goodwill and cooperation among all peoples."
As reported by the chancellor, the J.C.I. is now composed of 80 member nations which contain an aggregate of 316,000 individual members in over 7,000 local communities. It has and maintains its world headquarters in Miami Beach, Florida. From these headquarters, located in Florida since 1955, the functions of the organization are coordinated and administered. The chancellor also noted the following:
"(d) In 1955 there were three staff members on duty at the headquarters. At present there are 22, representing 11 nationalities. Over 8,000 original letters and about 12,000 copies of letters are sent out from there each year. In addition there is an extremely large volume of program materials which is dispatched. Also there is published and sent out the official journal and monthly news magazine of the organization. All of the mail bears the Miami Beach postmark and the letterheads, mast heads *7 and other location data on the materials sent out refer to the headquarters being located in Florida. The materials themselves refer frequently to Florida and various features of the locality of the headquarters."
Attention is focused upon the first point involved  whether the legislative act in question violates the provisions of § 10, Article IX, of the Florida Constitution. Section 10, Article IX, reads as follows:
"SECTION 10. Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stock-holder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."
In his consideration of whether the act constituted a violation of § 10, Article IX, the chancellor made the following pertinent observation about the J.C.I.:
"* * * to the extent that it sends out many thousands of pieces of material to all parts of the world which draw attention to Florida and to Miami Beach and reasonably serves to promote tourism to these areas, is functioning in the nature of a quasi-public corporation. The very fact of the location of the permanent headquarters at Miami Beach promotes tourism to that city and to Florida generally, but this alone would be merely incidental. It is really the tremendous volume of mailed and otherwise distributed material which publicizes Miami Beach and Florida and directly promotes its tourism that serves a public purpose which would authorize expenditure of state or local property, money or the pledge or loan of their credit in its furtherance." (Emphasis supplied.)
I concur in the pronouncements of the chancellor and agree with his well-reasoned opinion. The question of what constitutes a public purpose is often a difficult one, and is one depending largely on the circumstances of each particular case. (See Fla.Jur. § 83, Taxation, at 512.) The Court's role in making such a determination is clear. As has been stated many times, this Court should accord the legislative discretion great respect in its designation of those facilities and things which serve public purposes. However, the legislative determination is not conclusive as the question is one of law and is subject to judicial review.
In dealing with the central question to be decided  whether Chapter 65-277 is unconstitutional in that it constitutes a pledge or loan of the credit of the State of Florida in violation of § 10, Article IX of the Florida Constitution, an examination and understanding of this provision is necessary to a correct determination of the cause before us. This Court in Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119, speaking through Mr. Justice Terrell, incorporated in its opinion an accurate account of the historical background and policy factors leading to the adoption of § 10 of Article IX of the Florida Constitution. The portion of Bailey, supra, referred to above is pertinent to the cause at hand, and reads as follows:
"Section 10 of article 9 of our organic law was first adopted in 1875 as an amendment to section 7 of article 13 of the Constitution of 1868. The reason for this amendment was that, during the years immediately preceding its adoption, the state and many of its counties, cities, and towns had by legislative enactment become stockholders or bondholders in, and had in other ways loaned their credit to, and had become interested in the organization and operation *8 of, railroads, banks, and other commercial institutions. Many of these institutions were poorly managed, and either failed or became heavily involved, and, as a result, the state, counties, and cities interested in them became responsible for their debts and other obligations. These obligations fell ultimately on the taxpayers. Hence the amendment, the essence of which was to restrict the activities and functions of the state, county, and municipality to that of government, and forbid their engaging directly or indirectly in commercial enterprises for profit." (Emphasis supplied.)
The policy reasons responsible for the enactment of § 10, Article IX, obviously necessary to counter indiscriminately careless governmental spending, permeated court decisions for many years after the enactment of the said provision. Indeed, today § 10 of Article IX is a bulwark against the pledging or lending of the credit of Florida for other than public purposes. However, as Florida grows the state changes; and as Florida changes so do concepts of public interest and public purpose change. We are not a static nation nor are we a static state. See State v. City of Tallahassee (1940), 142 Fla. 476, 195 So. 402. The verbal context of a particular law or constitutional provision may remain unchanged, but it is inherent in some cases that application of such law be meted in accord with the concepts of the time. Thus, the concept of public purpose has been held to embrace construction of an automobile speedway facility  an unabashed tourist and business stimulant to a community  in State v. Daytona Beach Racing and Rec. Fac. Dist., (Fla.) 89 So.2d 34; construction of an inter-American cultural and trade center, State v. Inter-American Center Authority, Fla., 84 So.2d 9; construction of a warehouse to be leased to the Orange Bowl Committee for the purpose of storing floats, material and equipment necessary to the Orange Bowl festival and pageant, State v. City of Miami, Fla., 72 So.2d 655; appropriation of funds to the first accredited private medical school established in the state, Overman v. State Board of Control, Fla., 62 So.2d 696; construction of recreational facilities which could be leased out to private enterprises, State v. Escambia County, Fla., 52 So.2d 125; construction of an auditorium, stadium, boat basin and recreational center, State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218; advertising, at public expense, of a city, City of Jacksonville et al. v. Oldham, 112 Fla. 502, 150 So. 619; appropriation of money by county commissioners to assist in holding, or to hold a county fair, State ex rel. Barnett National Bank of DeLand v. Thursby et al., 112 Fla. 257, 150 So. 252; advertising to promote the citrus industry, C.V. Floyd Fruit Co. v. Florida Citrus Comm., 128 Fla. 565, 175 So. 248, 112 A.L.R. 562; accord, Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121.
A reading of some of these cases will disclose that control or supervision of a particular service or facility by a governmental body is immaterial in determining whether a public purpose is involved. The determining factor is simply whether the service or facility in itself amounts to a public purpose.
I agree with the construction of the learned chancellor that it appears
"* * * the statute does not appropriate monies merely as a subsidy to J.C.I. to further its own general objectives, but to acquire and continue the use of its facilities and its lines of communications to effectively and substantially stimulate and increase tourism in the state and in Miami Beach. It further appears that the conditions prescribed for and the means of disbursing the funds through the Board of Commissioners of State Institutions fairly contemplate the exercise by that Board of a reasonable discretion to require appropriate assurances that the disbursement of the funds will *9 result in the establishment and maintenance of the permanent headquarters of J.C.I. in Miami Beach with the continuance of the manner of dissemination and the content of material which has been deemed promotional of tourism in the state and which has induced the appropriation." (Emphasis supplied.)
That tourism is of the greatest import to our state can not be disputed. In State v. Inter-American Center Authority, supra, this Court quoted with approval from the Ebasco report (of a nationally recognized firm of consulting engineers):
"`(P. 24): The tourist trade is Florida's principal source of income. Its importance to the State may be measured by the fact that it almost equals the combined income from agriculture and manufacturing. * * *'"
It is a matter of common knowledge that public governmental authorities, both state and local, have for many years bestowed public funds upon the state chamber of commerce and local chambers of commerce in recognition and consideration of their services in advertising and promoting state and community attractions and advantages. It would appear to be a reversal of this long accepted policy in our tourist state if the subject legislative appropriation in behalf of the Junior Chamber International was judicially rejected on the bases of the objections urged.
The words "Chamber of Commerce" and "Junior Chamber" connote in the common intelligence quasi-public organizations which are dedicated to furthering public programs promoting civic and community advantages and attractions. It is common knowledge such organizations have long records of quasi-public service. They encourage and stimulate community progress. It is little wonder the Legislature has a history of extending to them public support because they serve unquestioned public purposes.
The Junior Chamber International by its very location in the State will serve to stimulate tourist convention business in Miami Beach and in Florida. Its headquarters building will be a permanent meeting place for representatives of its member units throughout the world. The building is also designed to be a showcase for the display of civic and cultural exhibits of said member organizations which will attract tourist interest. Because of the unique nature of the Jaycee civic programs the location of its international headquarters in Florida will directly serve as a stimulant to our tourist industry and cannot help but generate international interest in Florida's cultural, business, industrial and agricultural potentials.
The appropriation here is quite similar to an expenditure of Dade County from the proceeds of revenue bonds to construct a county planetarium to be operated by a non-profit quasi-public corporation. This expenditure was approved by our Court in Burton v. Dade County (1964), 166 So.2d 445. There, we stated, text 448:
"* * * The building will be built on county-owned property located in the City of Miami, which is now occupied in part by a county-owned museum. The museum is supervised and operated by a non-profit quasi-public corporation known as the Museum of Science and Natural History. It is contemplated that the Planetarium will be similarly operated by this non-profit corporation as a public service under an arrangement with the County Commissioners. This is strictly an operating, managerial arrangement for the convenience of the public. While a fee will be charged for admission to the Planetarium, all expenses of the operation will be paid out of the income and no part of the proceeds, if any, will inure to private parties."
* * * * * *
"* * * The proposed Planetarium is well within this category of county functions. *10 While the operating non-profit corporation is a membership organization, it is open to any member of the public who wishes to join. It is in no sense a a private concern and its members volunteer their time and services in the conduct of its program. The actual beneficiaries of the arrangement are the county and its citizens."
* * * * * *
"* * * The proposed method of operation through the facilities of the non-profit quasi-public organization does no violence to Article IX, Section 10, supra. * * *"
Fears that judicial approval of the instant appropriation may be opening a Pandora's box permitting subsidies to worthwhile organizations are allayed by the fact the primary purpose of this appropriation, as well as the primary benefit derived, is the obvious promotion of tourism in Florida. The things the Junior Chamber International stand for are praiseworthy and meritorious and emphasize that the association is not engaged in activities which are contrary to the public interest. However, an appropriation cannot be made by the State to an organization merely because it is engaged in a worthy project that might be of incidental benefit to the public interest. But, as previously noted, the cause herein involves employment of the services and facilities of a quasi-public non-profit association the members of which have a long standing reputation and history of performing a worthwhile and proper governmental function. (See, for example, Raney v. City of Lakeland, Fla., 88 So.2d 148.)
The two remaining contentions  deficiency of title and unconstitutional delegation of legislative authority  do not appear to be well founded.
THORNAL, C.J., and ROBERTS, J., concur.
NOTES
[1] On petition for rehearing appellees urge in support of their contention that we consider the provisions of a lease running from the City of Miami Beach to Junior Chamber International, appellee, dated May 18, 1966. The lease was not executed until after this cause had been tried and appealed. It is not in the record on appeal and is not pertinent to the basic issue involved.

Our original opinion filed October 26, 1966, has been withdrawn and this opinion substituted in lieu thereof.
[2] "Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stock-holder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."
[3] 92 Fla. 1030, 111 So. 119 (1926).
[4] Id. at 1033, 111 So. at 120.
[5] 88 So.2d 148 (Fla. 1956).
[6] 112 Fla. 257, 150 So. 252 (1933).
[7] 62 So.2d 696 (Fla. 1953).
[8] 66 So.2d 209 (Fla. 1953).
[9] 72 So.2d 655 (Fla. 1954).
[10] 146 So.2d 100 (Fla. 1962).
[11] 113 So.2d 374 (1959).
[12] 93 So.2d 608 (Fla. 1957).
[1] Cases collected in State v. Clay County Development Authority, Fla. 1962, 140 So.2d 576, 581, note 12.
[2] Ibid, p. 580, referring to Section 10, Art. IX, Fla. Const.
[3] State v. Town of North Miami, Fla., 59 So.2d 779, 785, quoted and relied on in State v. Clay County Development Authority, note 1 supra.