Mr. John R. Dowd County Attorney Okaloosa County Post Office Box 404 Shalimar, Florida 32579
Dear Mr. Dowd:
This is in response to your request for an opinion on substantially the following question:
 MAY OKALOOSA COUNTY EXPEND TOURIST DEVELOPMENT TAX REVENUES TO MAINTAIN ALL BEACHES OPEN TO AND USED BY THE PUBLIC ALONG THE SHORE OF THE GULF OF MEXICO FROM THE DUNE LINE TO THE WATER'S EDGE?
You state in your letter that there are in excess of 13 miles of shoreline bordering the Gulf of Mexico in Okaloosa County for which revenue from a proposed tourist development tax could be used for beach maintenance. You further state that the mean high-water line has not been established pursuant to Part II of Ch. 177, the Coastland Mapping Act of 1974, F.S., for the majority of the shoreline. You express concern that the lack of an established mean high-water line might preclude the authorized expenditure of tourist development tax revenues.
Section 125.0104, F.S., as amended by Ch. 86-4, Laws of Florida, known as the Local Option Tourist Development Act, provides the authorization and procedures for counties to levy and impose, subject to referendum approval, a tax to be used for purposes specified therein. The authorized uses for the revenues generated are set forth in subsection (5) of the statute which, in relevant part, provides:
(5) AUTHORIZED USES OF REVENUE. —
 (a) All tax revenues received pursuant to this section by a county imposing the tourist development tax shall be used by that county for the following purposes only:
* * *
 4. To finance beach improvement, maintenance, renourishment, restoration, and erosion control.
The issue raised in your letter of inquiry involves the physical area over which the expenditure of tax revenues would be proper. You state that the mean high-water line has not been established in Okaloosa County pursuant to Part II of Ch. 177, F.S., and question whether the expenditures would be proper for maintenance of the area "from the dune line to the water's edge."
The primary rule of statutory construction is that the intent of the Legislature as gleaned from the statute is the law. Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc.,434 So.2d 879 (Fla. 1983); State v. Williams, 343 So.2d 35 (Fla. 1977). It appears clear that the Legislature authorized the expenditure of tourist development tax revenues under s. 125.0104(5)(a)4., F.S., in order to provide a funding mechanism for beach erosion control and related projects. See, s. 40, Ch. 85-55, Laws of Florida, which added subparagraph (5)(a)4. to s. 125.0104. Compare, AGO 79-30, wherein this office concluded that in the absence of such authorization in the statute, tourist development tax revenues could not be used for publicly owned and operated parks or beaches under s. 125.0104(5)(a). In authorizing the expenditure of tourist development tax revenues for beach erosion control and related projects, s. 125.0104 contains no requirement of, or provision for, the establishment of a mean high-water line prior to the expenditure of such tax revenues. However, a statute must be read in pari materia with other statutes on the same subject and harmonized, whenever possible. See, Villery v. Florida Parole and Probation Commission, 396 So.2d 1107 (Fla. 1980) (whenever possible, full effect must be given to all statutory provisions and statutes should be construed in harmony with each other); Mann v. Goodyear Tire and Rubber Company, 300 So.2d 666 (Fla. 1974).
The Legislature in the "Beach and Shore Preservation Act," Parts I and II of Ch. 161, F.S., has declared the state's policy towards beach and shore preservation. Section 161.101(1), F.S., as amended by s. 5, Ch. 86-138, Laws of Florida, sets forth the state's policy:
 The Legislature recognizes that beach erosion is a statewide problem that does not confine its effects to local governmental jurisdictions and that beach erosion can be adequately addressed most efficiently by a state-initiated program of beach restoration and renourishment. However, since local beach communities derive the primary benefits from the presence of adequate beaches, a program of beach restoration and renourishment should not be accomplished without a commitment of local funds to combat the problem of beach erosion. Accordingly, the Legislature declares that the state, through the Department of Natural Resources, shall determine those beaches which are critically eroding and in need of restoration and renourishment and may authorize the expenditure from the Erosion Control Trust Fund of the amount necessary to pay up to 75 percent of the actual costs for restoring and renourishing a critically eroded beach. The local government in which the beach is located shall be responsible for the balance of such costs.
Section 161.141(1), F.S., as amended by s. 7, Ch. 86-138, Laws of Florida, states:
 The Legislature hereby declares that it is the public policy of the state to cause to be fixed and determined, pursuant to beach restoration and renourishment and erosion control projects, the boundary line between sovereignty lands of the state bordering on the Atlantic Ocean, the Gulf of Mexico, and the bays, lagoons, and other tidal reaches thereof, and the upland properties adjacent thereto. . . .
Section 161.141(1), F.S., as amended, however, also requires that "prior to construction of such beach restoration project, the board of trustees shall establish the line of mean high water for the area to be restored. . . ." The foregoing statute thus clearly expresses the Legislature intent that a mean high-water line be established prior to the initiation of beach restoration or renourishment projects undertaken pursuant to Ch. 161, F.S. And see, s. 161.041, F.S., which requires any person, firm, corporation, county, municipality, township, special district, or any public agency desiring to make any coastal construction or reconstruction or change of existing structures, or any construction or physical activity undertaken specifically for shore protection purposes, or other structures and physical activity upon sovereignty land of Florida, below the mean high-water line of any tidal water of the state, a coastal construction permit must be obtained from the Department of Natural Resources prior to the commencement of the work. The state has an ongoing program for the coastal mapping of the state to establish the mean high-water line. See, s. 177.26, F.S., which provides:
 The Legislature hereby declares that accurate maps of coastal areas are required for many public purposes, including, but not limited to, the promotion of marine navigation, the enhancement of recreation, the determination of coastal boundaries, and the implementation of coastal zone planning and management programs by state and local governmental agencies. Accordingly, a state coastal mapping program is declared to be in the public interest. The Legislature further recognizes the desirability of confirmation of the mean high-water line, as recognized in the State Constitution and defined in s. 177.27(15) as the boundary between state sovereignty land and uplands subject to private ownership, as well as the necessity of uniform standards and procedures with respect to the establishment of local tidal datums and the determination of the mean high-water and mean low-water lines, and therefore directs that such uniform standards and procedures be developed.
You state that the revenue is to be used to clean and maintain beaches open to the public along the shore of the Gulf of Mexico. The area of land below the mean high-water line is state sovereignty land owned by the State of Florida as part of its sovereign rights acquired at the time it was admitted into the Union in 1845. See, Martin v. Busch, 112 So. 274 (Fla. 1927). See also, s. 161.191(1), F.S., vesting title to all lands seaward of the erosion control line in the state; title to lands landward of such line are vested in the upland owners. And see, ss.161.141-161.211, F.S., providing for the establishment of such line. To the landward side of the mean high-water line (or erosion control line), title to such property may be in private ownership or public ownership.
To the extent the tourist development tax revenues are used to maintain only county-owned beaches, such expenditure would appear to be permissible. See, however, s. 161.052(1), F.S., prohibiting a county, among others, from excavating or constructing any dwelling house, hotel, motel, apartment building, seawall, revetment, or other structure incidental to or related to such structure within 50 feet of the line of mean high water at any riparian coastal location fronting the Gulf of Mexico or Atlantic coast shoreline of the state. For purposes of this prohibition, the erosion control line, if established, or the presently existing mean high-water line, whichever is more landward, shall be considered to be the mean high-water line. But see, s.161.053(11), F.S., which in pertinent part, provides "upon the establishment of coastal construction control lines, or the establishment of coastal contruction zoning and building codes as provided in subsection (4), the provisions of s. 161.052 shall be superseded by the provisions of this section"; and s. 161.053(2), F.S., providing in pertinent part that upon the establishment, approval and recommendation of the coastal construction control lines, "no person, firm, corporation, or governmental agency shall construct any structure whatsoever seaward thereof; make any excavation, remove any beach material, or otherwise alter existing ground elevations." If the terms of s. 161.052(1), F.S., are applicable to the project in question, then clearly the mean high-water line must be established in order to avoid the prohibition contained therein. Moreover, where the proposed expenditure involves any coastal construction or reconstruction or change of existing structures, or any construction or physical activity undertaken specifically for shore protection purposes within the terms of s. 161.041, F.S., upon sovereignty lands of the State of Florida, a coastal construction permit must be obtained from the Department of Natural Resources prior to the commencement of such work. See, s. 161.021(4), F.S., renumbered by Ch. 86-138, Laws of Florida, as subsection (5) defining "coastal construction," to include "any work or activity which is likely to have a material physical effect on existing coastal conditions or natural shore and inlet processes." And see, s. 253.77(1), F.S., which provides:
 No person may commence any excavation, construction, or other activity involving the use of sovereign or other lands of the state, the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund or the Department of Natural Resources under this chapter, until such person has received from the Board of Trustees of the Internal Improvement Trust Fund the required lease, license, easement, or other form of consent authorizing the proposed use.
Thus, any activity coming within the terms of this statute on the state owned portions of the beaches must comply with the requirements therein.
The expenditure of tourist development tax revenues relating to upland property owned by private parties implicates other constitutional principles. The expenditure of public funds is limited by the provisions of s. 10, Art. VII, State Const., prohibiting the state or counties or municipalities or any agency thereof from using, giving, or lending its taxing power or credit to aid any private interest or individual. It is only when there is some clearly identified and concrete public purpose as the primary objective and a reasonable expectation that such purpose will be substantially and effectively accomplished, that the state or its subdivisions may disburse, loan or pledge public funds or property to a nongovernmental entity. O'Neill v. Burns,198 So.2d 1 (Fla. 1967). The Florida Supreme Court in Orange County Industrial Development Authority v. State, 427 So.2d 174
(Fla. 1983), reaffirmed its test that the purpose served in the proposed expenditure must be paramountly a public one. If, however, the benefits to a private party are the paramount purpose of a project, then the expenditure is not constitutionally valid even if the public derives some benefit therefrom. And see, Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304
(Fla. 1971); see also, AGO 79-14 (expenditure of public funds by a municipality to repair or maintain private streets would appear to contravene s. 10, Art. VII, State Const.).
Furthermore, s. 1, Art. VII, State Const., impliedly limits the imposition of taxes and the expenditure of tax revenues to public purposes. See, Board of Commissioners of Escambia County v. Board of Pilot Commissioners of Port of Pensacola, 42 So. 697
(Fla. 1906); Brown v. Winton, 197 So. 543 (Fla. 1940); AGO's 82-23, 80-93, 71-28. As a general principle, the power to levy and collect taxes and the power to appropriate public funds are coexistent and if a tax cannot be levied for a particular purpose, no appropriation of public money can be made for such purpose. See generally, 81A C.J.S. States s. 205, in which the rule is stated: "Generally, under express or implied constitutional provisions, public funds may be used only for a public purpose. . . ." And see, 81A C.J.S. States ss. 207, 209, 210; 56 Am.Jur.2d Municipal Corporations s. 588. In Brumby v. City of Clearwater, 149 So. 203
(Fla. 1933), the Florida Supreme Court, construing an analogous provision of the 1885 Constitution, invalidated a contract between a municipality and a private individual under which the municipality agreed to dredge a channel leading to the individual's place of business. The Court stated that the contract was void because it clearly required the appropriation of public money for the individual's benefit and was an attempt to finance a private business enterprise for the use and benefit of an individual. Compare, Hillsboro Island House Condominium Apartments, Inc. v. Town of Hillsboro Beach, supra, wherein the Court upheld the issuance of bonds for beach restoration by the town even though title to the improved beach land was divided between the upland owners and the state and the town owned no property along the ocean shore since a substantial portion of improved beach would be within domain of the sovereign and the town was statutorily authorized to exercise its police power over such area. The determination, however, in any given instance as to whether a particular expenditure satisfies a public purpose is one which the board of county commissioners, as the legislative and governing body of the county, must make, setting forth the requisite legislative findings and intent; such a determination may not be delegated to the Attorney General nor may the Attorney General undertake to make such legislative findings and determinations for the county.
Accordingly, while the establishment of the mean high-water line is a necessary prerequisite to the initiation of any beach erosion control project pursuant to the provisions of ss. 161.141-161.211, F.S., no such requirement appears to so limit the expenditure of tax revenues generated under s. 125.0104, F.S., as amended for the purposes of "beach improvement, maintenance, renourishment, restoration, and erosion control." To the extent that a county undertakes a local project exclusive of the beach and shore preservation projects authorized under Ch. 161, F.S., I am of the opinion that the requirements pertaining to the establishment of the mean high-water line contained in Ch. 161, F.S., are not applicable to such entirely local projects. But see, ss. 161.041
and 161.052, F.S., pertaining to coastal construction on state sovereignty lands and within 50 feet of the line of mean high water, respectively. Any coastal construction projects, however, undertaken by the county which come within the purview of Ch. 161, F.S., as amended, must comply with the requirements of that act. Although I am unable to discern any legislative intent to subject the expenditure of tax revenues generated under s. 125.0104, F.S., to the requirements contained in Ch. 161, F.S., the expenditure of tax revenues are subject to constitutional limitations generally applicable to the expenditure of public funds discussed above. Therefore, any benefit accruing to private uplands property owners as a result of county beach maintenance projects using tourist development tax revenues must be incidental to a paramount public purpose or benefit being served.
While s. 125.0104, F.S., places no special requirements upon the expenditure of such tax revenues other than the enumeration of the authorized uses set forth therein, when a unit of local government or person undertakes activities on or near the sovereign-owned beaches, the requirements of other pertinent Florida laws must be fulfilled. As to other requirements under Ch. 161, F.S., or s.253.77, F.S., or any other applicable provisions of law, this office expresses no opinion, such requirements are subject to the interpretation and application of the public agency vested with the administration of those laws.
In conclusion, I am therefore of the opinion that a county may expend tourist development tax revenues to finance beach cleaning and maintenance without the necessity of establishing the mean high-water line so long as such expenditure paramountly serves a public purpose, and there is compliance with the requirements of Ch. 161, F.S., and s. 253.77, F.S., where applicable.
Sincerely,
Jim Smith Attorney General
Prepared by:
Craig Willis Assistant Attorney General