Mr. Maynard A. Gross Town Attorney Town of Medley Suite 200, Dadeland West 10651 North Kendall Drive Miami, Florida 33176
Dear Mr. Gross:
This is in response to your request for an Attorney General's Opinion on substantially the following question:
 WHETHER A MUNICIPALITY MAY PURCHASE REAL ESTATE FOR THE PURPOSE OF CONSTRUCTING A RESIDENTIAL MOBILE HOME PARK AND LEASING MOBILE HOME SITES TO MUNICIPAL RESIDENTS WHO MEET SPECIFIED LOW INCOME CRITERIA?
You state that the Town of Medley has approximately 600 permanent residents who live in a privately owned mobile home park. Many of the residents are retired and collecting social security benefits and/or pensions and many of these residents fall within a low income category. The owner of the mobile home park has periodically raised the site rents to the point where numerous residents are finding it increasingly difficult to afford paying. However, a shortage of mobile home parks in the area makes the relocation of mobile homes difficult. Therefore, the Town Council has been investigating the possibility of purchasing land within the town limits and constructing a mobile home park thereon. The sites would be leased to permanent town residents who meet specified low income criteria. You note that the Town Council is anxious to provide the facility under consideration as "[i]t is a well needed project from which many Town residents, both present and future, can hope to benefit." You state that the concept would not be one of profit for the town, but rather to make the rental as reasonable as possible consistent with generating enough revenue to operate the park and related facilities. You also express concern as to whether the town could legally engage in a business enterprise which would directly compete with a private business.
In Florida, broad home rule powers have been conferred upon municipalities through the enactment of Ch. 166, F.S., the Municipal Home Rule Powers Act, which implements the provisions of s. 2, Art. VIII, State Const. See, City of Miami Beach v. Rocio Corporation, 404 So.2d 1066, 1069 (3 D.C.A.Fla., 1981), pet. for rev. den., 408 So.2d 1092 (Fla. 1981); State v. City of Sunrise,354 So.2d 1206, 1209 (Fla. 1978). Pursuant to s. 166.021(1), F.S., municipalities "have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law." A "[m]unicipal purpose" is defined in s.166.021(2) to mean "any activity or power which may be exercised by the state or its political subdivisions." In City of Boca Raton v. Gidman, 440 So.2d 1277, 1280 (Fla. 1983), the Court noted that whenever a municipality exercises its powers, a two-tiered analysis is presented. First, was the action undertaken for a municipal purpose? If so, was such action expressly prohibited by the constitution, general or special law, or county charter? See also, City of Winter Park v. Montesi, 448 So.2d 1242 (5 D.C.A.Fla., 1984), pet. for rev. den., 456 So.2d 1182 (Fla. 1984); State v. City of Jacksonville, 50 So.2d 532, 535 (Fla. 1951) ("a municipal purpose may now comprehend all activities essential to the health, morals, protection and welfare of the municipality"). Cf., Hamler v. City of Jacksonville, 122 So. 220 (Fla. 1929); City of Clearwater v. Caldwell, 75 So.2d 765 (Fla. 1954). And see, s. 10, Art. VII, State Const., prohibiting the state any county, school district, municipality, special district, or agency thereof from giving, lending or using its taxing power or credit to aid any corporation, association, partnership or person; O'Neill v. Burns, 198 So.2d 1 (Fla. 1967), wherein the Court mandated a clearly identified and concrete public purpose as the primary objective and a reasonable expectation that such purpose will be substantially and effectively accomplished before the state or its subdivisions may disburse, loan or pledge public funds or property to a nongovernmental entity.
The Legislature has manifested a general declaration of policy that the provision of housing to low income individuals is a public purpose for which public moneys may be expended. See, e.g., Part III of Ch. 163, F.S., the "Community Redevelopment Act of 1969," specifically s. 163.335, which in setting forth legislative findings and declarations of necessity, provides in subsection (5) "that there exists in counties and municipalities of the state a severe shortage of housing affordable to residents of low or moderate income, including the elderly. . . ." And see, s.163.340(9), defining "[c]ommunity redevelopment" or "redevelopment" to mean "undertakings, activities, or projects of a . . . municipality, or community redevelopment agency in a community redevelopment area for the . . . provision of affordable housing, whether for rent or for sale, to residents of low or moderate income, including the elderly. . . ." Compare, Ch. 421, F.S., pertaining to public housing, which declares in s.421.02(1), inter alia, "that within the state there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford. . . ." See also, s. 421.04
which authorizes the creation of city housing authorities, and s.421.08, F.S. (1986 Supp.), which accords such authorities powers, including in subsection (6), the power to determine "where there is a shortage of decent, safe, and sanitary dwelling accommodations for persons of low income" and the power "to make studies and recommendations relating to the problem of . . . providing dwelling accommodations for persons of low income. . . ." While the foregoing statutes do not specifically provide for the type of project contemplated in the instant inquiry, they do manifest a legislative determination that the provision of low income housing by a governmental entity constitutes a public purpose.
Numerous Florida judicial decisions have recognized the power of municipalities to engage in private business, albeit such city-operated business competes with a privately owned business. See, e.g., City of Winter Park v. Montesi, 448 So.2d 1242 (5 D.C.A. Fla., 1984) (sale of photographs of sinkhole); Gate City Garage v. City of Jacksonville, 66 So.2d 653 (Fla. 1953) (construction and operation of parking garage); Starlight Corporation v. City of Miami Beach, 57 So.2d 6 (Fla. 1952) (owning and operating an auditorium, including booking attractions for the auditorium). See generally, 12 McQuillin Municipal Corporations s. 36.02.05; 62 C.J.S. Municipal Corporations s. 110. It must be emphasized, however, that "[w]hen a municipality operates in its proprietary capacity, it is governed by the same laws and may exercise the same rights as a private corporation engaged in a similar undertaking." City of Winter Park v. Montesi, supra at 1245.
In addition, Ch. 513, F.S., relating to Mobile Home and Recreational Vehicle Parks, defines a mobile home park as "a place set aside and offered by a person or public body, for either direct or indirect remuneration of the owner, lessor, or operator of such place, for the parking or accommodation of six or more mobile homes utilized for sleeping or eating." (e.s.) Section513.01(3), F.S. Section 513.02(1), F.S., provides in part that "[n]o person or public body may establish or maintain any mobile home park . . . in this state without first obtaining a permit from the department [Department of Health and Rehabilitative Services]." (e.s.) Each person or public body which seeks a permit to "establish, operate, or maintain" a mobile home park must pay to the department a permit fee as prescribed in s. 513.045(1), F.S. See also, ss. 513.055(1)(a); 513.10(1). A "public body" is defined in s. 1.01(9), F.S., as including "counties, cities, towns, villages, special tax school districts, special road and bridge districts, bridge districts, and all other districts in this state." (e.s.) Thus, Ch. 513, F.S., clearly countenances the establishment, operation and maintenance of a mobile home park by a public body, provided the requisite permit from the Department of Health and Rehabilitative Services has been obtained and the provisions of Ch. 513 and the rules promulgated thereunder complied with. See, s. 513.05, F.S.; Ch. 10D-26, F.A.C.
You have stated that the project under consideration in the instant inquiry is well needed and will benefit present and future town residents. Based upon the foregoing and in view of the broad home rule powers afforded municipalities, I am of the opinion that a municipality may purchase real estate for the purpose of constructing a residential mobile home park and leasing mobile home sites to municipal residents who meet specified low income criteria. However, in the event the Town Council of the Town of Medley should decide to proceed with this matter, your attention is directed to Ch. 723, F.S., the Florida Mobile Home Act. Section723.004, F.S. (1986 Supp.), sets forth the legislative intent and provides in subsection (1):
 There is hereby expressly preempted to the state all regulation and control of mobile home lot rents in mobile home parks and all those other matters and things relating to the landlord-tenant relationship treated by or falling within the purview of this chapter. Every unit of local government is prohibited from taking any action, including the enacting of any law, rule, regulation, or ordinance, with respect to the matters and things hereby preempted to the state.
The Division of Florida Land Sales, Condominiums, and Mobile Homes of the Department of Business Regulation is charged with enforcing and ensuring compliance with the provisions of Ch. 723, F.S. Section 723.005, F.S. Accordingly, any question relating to the provisions of Ch. 723 should be directed to that agency. See, s.723.006, F.S. (1986 Supp.), setting forth with particularity the powers and duties of the division. See also, ss. 723.011 and723.012, F.S. (1986 Supp.), requiring that every mobile home owner of a park containing 26 or more lots must offer to each prospective lessee a prospectus or offering circular disclosing specified information. And see, s. 723.013, F.S., describing the contents of a written notification which must be supplied to a mobile home owner who enters into a rental agreement in which a prospectus is not provided. The balance of Ch. 723 contains provisions governing, inter alia, advertising materials (s.723.016, F.S.); the general obligations of a mobile home park owner and mobile home owner (ss. 723.022, 723.023, F.S.), cf., s.723.059, F.S. (1986 Supp.); mobile home lot rental agreements (ss.723.031 F.S. [1986 Supp.], 723.032, F.S. [1986 Supp.], 723.033, F.S.); right of mobile home owners to peaceably assemble (ss.723.054, 723.055, 723.056, F.S.); grounds and proceedings pertaining to eviction (ss. 723.061, F.S. [1986 Supp.], 723.062,723.063, F.S.); sale of the mobile home park (ss. 723.071,723.072, 723.073, 723.074, F.S.); homeowners' associations (ss.723.075, 723.076, F.S. [1986 Supp.], 723.077, 723.078, 723.079, F.S.); and a restriction upon governmental action affecting the removal of mobile home owners. See, s. 723.083, F.S. The act also sets forth directives as to lot rental increases, reductions in services or utilities, changes in rules and regulations, and provides for mediation or arbitration of disputes. See, ss.723.037, F.S. (1986 Supp.); 723.038, F.S.
In sum, it is my opinion that the Town of Medley may purchase real estate for the purpose of constructing a residential mobile home park and leasing mobile home sites to municipal residents who meet specified low income criteria.
Sincerely,
Robert A. Butterworth Attorney General
Prepared by:
John Rosner Assistant Attorney General